# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE E. KAMINSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 2598 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | Jeffrey T. Gilbert |
| of Social Security Administration, | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND FACTS

This matter is before the Court on the parties' cross-motions for summary judgment. Claimant Michelle E. Kaminski ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Claimant's applications for Disability Insurance Benefits and Supplemental Security Income. Claimant raises the following issues: 1) whether the Administrative Law Judge ("ALJ") improperly analyzed Claimant's credibility; 2) whether the ALJ failed to explain how Claimant's obesity on its own and in combination with her other impairments were considered; and 3) whether the ALJ failed to build a logical bridge between the evidence and his conclusions when determining Claimant's Residual Functional Capacity ("RFC"). For the following reasons, Claimant's motion is granted and the case is remanded to the Social Security Administration for further proceedings pursuant to this opinion.

A.  **Procedural History**

Claimant initially filed for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on March 24, 2006 alleging a disability onset date of October 2, 2004. R. 42. The Social Security Administration ("SSA") denied her applications on May 26, 2006. R. 63. Claimant then filed a request for reconsideration, which the SSA denied on June 12, 2006. R. 69. Shortly thereafter, Claimant requested a hearing before an ALJ. R. 78.

On January 8, 2008, ALJ Joel Fina presided over a hearing at which Claimant appeared with her attorney. R. 49. Only Claimant and vocational expert, Lee Knutson, testified at the hearing. No medical testimony was heard. On January 23, 2008, the ALJ rendered a decision finding that Claimant was not disabled under the Social Security Act. R. 58. The ALJ found that Claimant had the RFC to perform sedentary work limited to simple, routine, and repetitive tasks that allowed her to sit or stand alternatively at will. R. 56. The ALJ also found that a significant number of jobs existed in the national economy such that one of Claimant's age, education, work experience, and RFC would be "capable of making a successful adjustment to other work." Based on those facts, the ALJ found that Claimant was "not disabled." R. 58.

Claimant filed a request for review of the ALJ's decision. R. 1. On March 5, 2009, the Appeals Council denied that request. *Id.* The Appeals Council subsequently set aside that denial, but on April 3, 2009, denied Claimant's request for review again. *Id.* That left the ALJ's decision as the final decision of the Commissioner. *Id.* On April 29, 2009, Claimant filed this action for review pursuant to 42 U.S.C. § 405(g).

### B. Hearing Testimony – January 8, 2008

#### 1. Michelle E. Kaminski – Claimant

At the time of the hearing, Claimant was 37 years old, married, and living with her husband and two sons (ages 12 and 6). R. 16-17. Claimant testified that she completed high school and two years of college. R. 17. She last worked as a loss prevention manager at Montgomery Wards. R. 17-18. After having worked there for nine years, in 2001 the company went bankrupt and Claimant was let go. *Id.* Subsequent to that, Claimant made no attempts to find work. R. 18. She testified that she had not worked since her alleged disability onset date of October 2, 2004. *Id.* She also testified that she had no knowledge of any event that may have triggered the onset of her alleged disability. *Id.*

Claimant testified that her lower back, leg, and foot pain prevent her from working. R. 18-24. She stated that she felt pain even while testifying at the hearing, which she described as feeling "menstrual cramps grabbing" that made her left foot tingle. R. 24. At the hearing, she characterized her pain as an 8 out of 10, 10 being the worst. *Id.* She testified that she typically takes Vicodin and Tramadol several times daily to help deal with her pain, both of which make her feel tired and dizzy. *Id.* She took neither medication on the day of the hearing. *Id.* She also testified that she takes thyroid and cholesterol medications. R. 24-25.

In addition to her lower back, leg, and foot pain, Claimant testified that she suffers from carpel tunnel syndrome. R. 27. She had carpel tunnel release surgery on her right wrist, which is where her problems are more severe. *Id.* Despite the surgery, she still experiences a "jamming sensation" on her right side about once a month, which is triggered by activities such as playing with her son or opening jars. R. 28. At the time of the hearing, Claimant was approximately 5'1'' tall and 187 pounds. R. 17.

Claimant testified that she can lift a gallon of milk with one hand. R. 22-23. She also testified that she can stand for 10 minutes or sit or walk for 10 to 15 minutes before becoming uncomfortable. *Id.* She has difficulty climbing stairs, including the fifteen leading to the second floor of her house, though she has never fallen while climbing them. R. 23. She is able to take care of her own personal needs—combing her hair and bathing—but has trouble doing so. R. 19. She testified that she is unable to take baths, as she cannot pull herself into and out of the bathtub, and when her pain is severe, her husband has to help lift her from a seated position. R. 31. Though she has trouble doing household chores, she is able to do them to a limited extent: she can wash dishes, but not an entire sink load; sweep and vacuum, but not an entire room; and fold laundry when it is brought to her. R. 19-20. She also testified that she is able to walk to the mailbox in her driveway, but unable to clean the bathroom or take out the trash. R. 20-21. Claimant also uses an electric cart to grocery shop. *Id.* She recently flew to Arizona for three months to visit her father, sister, and brother in-law. R. 25. She saw a doctor during that visit due to her pain. R. 25-26.

Claimant testified that on a typical morning she gets up between 7-7:30am, has coffee, and makes sure her two sons are ready for school. R. 26. During the day, she watches television, reads, talks on the telephone, and tries to sleep, as she has a hard time sleeping at night due to her pain. R. 22, 26-27. Out of every hour that Claimant sits, she "might" elevate her legs for 20-25 minutes, which sometimes eases her pain, "but then [it comes] right back again." R. 30. She is no longer able to do much with her kids— she can no longer ride a bike or "play ball" with them. R. 29. Claimant also testified that she smokes about a pack of cigarettes a day. R. 22.

### 2. Lee Knutson – Vocational Expert ("VE")

Lee Knutson testified as a vocational expert. R. 32. The VE described Claimant's past work as follows: a loss prevention manager is skilled and light work, a loss prevention associate is semi-skilled and light work, and a personal banker is on the "lower end" of skilled and light work. R. 34. However, Claimant performed her job as a personal banker primarily while sitting. *Id.* Thus, the VE testified that Claimant's job as a personal banker was sedentary work. *Id.*

The ALJ asked whether a person with Claimant's age, education, work experience, and skill set; limited to light work; never kneeling, crawling, or climbing ladders, ropes, or scaffolds; occasionally stooping, crouching, and climbing ramps or stairs; frequently balancing, handling objects, and fingering; avoiding concentrated exposure to excessive vibrations; and with an option to sit or stand alternatively at will would be able to perform Claimant's past work. *Id.* The VE indicated that, with those limitations, the hypothetical person could "probably" perform Claimant's past work. R. 35. Then, the ALJ proposed the same scenario, but limited the hypothetical person to sedentary work. *Id.* The VE responded that the only job the hypothetical person could still perform (from among Claimant's past work) is personal banking, as an individual could primarily sit in that job. *Id.* Following that, the ALJ asked, assuming those same vocational factors and limitations, whether any other jobs in the region or national economy exist that such a person could perform. R. 35-6. The VE responded that such a person could be an order clerk, surveillance system monitor, or cashier. R. 36. The VE estimated that there were 3,200, 1,850, and 4,300 jobs available in the Chicago metropolitan area for order clerks, surveillance system monitors, and cashiers, respectively. *Id.*

For the next hypothetical, the ALJ assumed the same factors and limitations in the previous question, but added that the work must be limited to "simple, routine, and repetitive

tasks." *Id.* The VE responded that such a person would not be able to perform Claimant's past work because that work is semi-skilled or skilled. R. 37. However, with the exception of the surveillance system monitor, which sometimes involves work that is not routine, the VE indicated that such a person could perform the jobs that he previously mentioned—order clerk and cashier— and that those positions exist in the same numbers as previously stated. *Id.*

Upon being questioned by the ALJ, the VE noted that competitive work would be precluded at all exertional levels for a person unable to engage in work activities on a regular and continuing basis for eight hours a day, five days a week, 40 hours per week, or an equivalent work schedule. *Id.* The VE indicated that 15 minute breaks are typically provided every 2 hours; lunch breaks are longer and usually last 30 minutes to an hour. R. 38. Relying on the Dictionary of Occupational Titles and Selected Characteristics of Occupations, the VE explained that taking unscheduled breaks in addition to those that are customarily provided would likely preclude one from keeping an unskilled job. *Id.*

On cross-examination by Claimant's attorney, the VE testified that a person would be unable to sustain employment as an order clerk or cashier if they could not be relied upon to make change or place orders correctly (due to an inability to concentrate) on a regular basis. R. 39. He indicated that a cashier or order clerk that made errors even one out of every ten transactions (i.e., had a 90% accuracy rate) would not be employable. *Id.*

C. **Medical Evidence**

   1. **Advocate Christ Medical Center**

Claimant received most of her treatment from Advocate Christ Medical Center. Claimant's records from Dr. Alexander Kmicikewycz date back to 2002. R. 209. Dr. Kmicikewycz's records show that Claimant came to him complaining of low back pain,

Page 6 of 22

numbness and tingling in both feet, and pain in both calves. R. 212. They also show that Claimant suffered from PVD, obesity, dyslipidemia, hypothyroidism, pre-hypertension, and that she was a smoker. R. 187. At various points, Dr. Kmicikewycz prescribed for Claimant Lovastatin, Levoxyl, Allegra, Norco, Hydrocodone, Aleve, Gabapentin, Singulair, Levothyroxine, Tramadol, and Vicodin, among other medications. R. 183, 303, 359.

Results from an MRI of the lumbar spine in June 2007 were compared to Claimant's November 2006 MRI. R. 451. A comparison of the two tests showed no interval change in the appearance of the lumbar spine. *Id.* The results noted that the lumbar spine alignment was well-preserved, the disc spaces were well maintained, and the discs were well hydrated. *Id.* A small lateral disc protrusion to the left at the L3-L4 disc level was shown, though it was noted that this only caused mild regional mass-effect. *Id.* Records from a January 7, 2006 CT scan showed no lumbar spondylolysis or spondylolisthesis. It also showed mild diffuse bulging of the discs at the L3-L4 and L4-L5 levels without any suggestion of a herniated nucleus pulposus. R. 212. An MRI given the same day showed mild diffuse bulging of the discs, which had not degenerated. R. 215. It also showed asymmetric mild bulging in the left L3-L4 foramen and right L4-L5 foramen without frank disc herniation or any definite mass-effect on the foraminal nerve roots. *Id.* There was no thecal sac stenosis, no enhancing mass, no subluxation, and no new focal disc protrusion. *Id.* The impression noted that there was no significant change from the lumbar MRI conducted in June 2005. *Id.* On March 25, 2005, a vascular extremity venous duplex bilateral was also conducted, and that test showed prominent nodes in the groin bilaterally and a negative bilateral lower extremity venous doppler. R. 217.

A lumbar myelogram dated December 1, 2006 indicated that the nerve root sleeves appeared well-filled and symmetric. R. 373. There was no evidence of an extradural impression

on the thecal sac or evidence of spinal stenosis. *Id.* A CT scan of the lumbar spine showed no evidence of disc herniation or spinal stenosis. R. 374. Reconstructed images showed normal vertebral body alignment with the disc spaces and neural canals maintained. Overall, the test was deemed "unremarkable." *Id.*

Dr. Roy Adair requested that Claimant undergo a second EMG in June 2007, which his records indicate showed a normal electrophysiologic examination of both lower extremities. R. 458. Dr. Adair performed Claimant's first EMG on April 4, 2006. R. 305. That exam showed significant pain behavior on the part of Claimant. *Id.* It also showed isolated large motor unit action potentials on the left tibialis anterior, which suggested previous neurogenic abnormality affecting that muscle. *Id.* Dr. Adair noted that without other abnormalities in the exam, it was not possible to explain what that was from. *Id.* He also explained that no electrophysiologic evidence of acute lumbosacral radiculopathy on either side or peripheral polyneuropathy was found. *Id.*

Records from Dr. Daniel Troy (orthopedist) showed that Claimant came to him complaining of chronic back pain and intermittent lower extremity pain. R. 223. He noted that she did not show any improvement after receiving a series of epidural steroid injections. *Id.* On March 13, 2006, Claimant underwent a discogram. That test was negative and did not confirm any correlation between Claimant's back and leg pain. *Id.* A post discography CT scan demonstrated annular tears at the L3-L4 and L4-L5 levels. *Id.* On March 21, 2006, Dr. Troy noted that, from a surgical standpoint, there was nothing else that he could offer. *Id.* He ordered an EMG and NCV, but indicated that he would most likely send Claimant to a pain clinic. *Id.*

Claimant was admitted to Advocate Christ Medical Center on December 7, 2005 due to a large abscess on her upper left inner thigh. R. 255. Claimant's abscess was drained and she was

discharged the following day. *Id.* Records from the Medical Center also show that she received outpatient physical therapy there. R. 273. However, on March 21, 2006, Claimant was discharged from those services after cancelling an appointment and not scheduling any others. *Id.*

On January 6, 2007, Dr. Ebby Jido saw Claimant at the Advocate Christ Pain Management Center. R. 437. Dr. Jido noted that Claimant had degenerative disk disease of the lumbar spine and obtained no relief from the epidural steroid injection therapy that she received. *Id.* Claimant's right sacroiliac joint was injected with 40 mg of Dep-Medrol and local anesthetic under fluoroscopy. *Id.* Dr. Jido also gave Claimant Neurontin to take three times a day with the hope that that would help her pain subside. *Id.* If that provided no relief, Dr. Jido planned to increase Claimant's pain medication or consider her as a candidate for spinal cord stimulation. *Id.*

### 2. Dr. Madala – Residual Functional Capacity ("RFC") Assessment

In May 2006, Dr. Vidya Madala, a non-examining state agency medical consultant, reviewed Claimant's medical records to provide his medical opinion as to Claimant's RFC. R. 293. Dr. Madala's report indicates that Claimant has degenerative disc disease and mild carpal tunnel syndrome. He found that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday. R. 294. Dr. Madala noted no further limitations. R. 293-300. In August 2006, upon reconsideration, Dr. Virgilio Pilapil reviewed Claimant's medical records and affirmed Dr. Madala's May 2006 RFC assessment. R. 343.

### 3. Dr. Keith L. Schaible

Dr. Kmicikewycz referred Claimant to Dr. Schaible. In his progress notes dated August 2, 2005, Dr. Schaible explained that Claimant came to him for an evaluation of back pain that led to shooting pain in both legs. His notes cite Claimant's past medical history of thyroid disease, increased cholesterol, carpal tunnel resection, appendectomy, and tonsillectomy. His evaluation of the June 2005 MRI is that it demonstrates mild degenerative disc disease. He wrote that the leftward foraminal disc protrusion really "looks like just degenerative changes." He found no herniated disc, no effect on the exiting root sleeve, and concluded that Claimant had no stenosis. Dr. Schaible also noted that Claimant's examination showed no percussion tenderness, negative straight leg raising sign, and symmetric and good strength. He wrote that she was able to walk on her heels and toes. Her deep tendon reflexes might be slightly depressed, but she had no signs of myelopathy or a radiculopathy. He concluded that Claimant's MRI showed nothing to warrant surgical intervention. He specifically noted that "conservative measures" were appropriate, including physical therapy and "possible" epidural injections. R. 314.

### 4. Parkview Orthopedic Group

Claimant visited Parkview Orthopedic Group on May 25, 2006. R. 328. Dr. Mekhail noted that Claimant complained of back pain and bilateral lower extremity tingling, numbness, burning, and some weakness. *Id.* He indicated that her current medications were Celebrex, Allegra, Levothyroxine, Singulair, Lovastatin, and Hydrocodone. *Id.* He wrote that Claimant's June 2005 MRI showed a very minimal L3-L4 foraminal disc bulge, but no significant nerve compression. *Id.* He also noted Claimant's negative discogram. *Id.* Dr. Mekhail recommended that Dr. Glantz look at Claimant's past EMG, as he noted it did not appear consistent with her radiculopathy, to determine whether there was any neuropathic element for Claimant's pain. R.

328-329. At that visit, Dr. Mekhail prescribed Claimant Lyrica. R. 329. If that failed to provide Claimant with long-term pain relief, he indicated that he would consider the use of a spinal cord stimulator. *Id.*

### 5. Dr. Daniel Hirsen

Dr. Kmicikewycz referred Claimant to Dr. Hirsen. R. 439. In a letter to Dr. Kmicikewycz dated April 5, 2007, Dr. Hirsen wrote that Claimant continued to complain of low back pain and received epidural blocks and injections in the sacroiliac joint without relief. *Id.* Dr. Hirsen explained that his additional diagnostic tests were all unrevealing. *Id.* The B27 test was negative; repeat plain films of the lumbar spine showed mild degenerative disk disease; and the ankles, sacroiliac joints, and pelvis films were all normal. *Id.* He explained that a past MRI scan of the lumbar spine showed some degenerative disc disease at L3-L5 levels without spinal stenosis, and that Claimant has what appears to be mild degenerative disc disease. *Id.* Dr. Hirsen further noted that Claimant received conservative treatments without improvement, and despite her continued complaints of pain, he had no additional therapy to recommend. *Id.*

### 6. Canyon Family Physicians

While in Arizona in December 2007, Claimant was seen by Physician Assistant Qureshi. Qureshi noted that Claimant complained of sharp shooting pain down her right leg and yellow sinus discharge for 3 days. He noted that Claimant was overweight. His musculoskeletal examination revealed normal posture, but a positive limp with ambulation. An MRI was also ordered. R. 460-61. Claimant returned to Canyon Family Physicians a week later. She was prescribed Dosepak, Flexeril, referred to orthopedics and pain management, and told to continue using ice or heat on the affected area. R. 463-64. The December 18, 2007 MRI showed that the conus and cauda equine appeared normal. The L1-L2, L2-L3, and L3-L4 discs were also